# BEHAVIORAL HEALTH SOLUTIONS, P.A.

Keith R. Hersh, Ph.D., Licensed Psychologist
William S. Sampson, Ph.D., Licensed Psychologist



## CONFIDENTIAL

Material contained in this report is confidential and sensitive, and it should not be re-released without the informed consent of the client.

### Adult Psychosexual Evaluation

**Name:** SAVAGE, Van William
**Date of Birth:** 03/08/1987

**Evaluator:** Keith R Hersh, Ph.D., Licensed Psychologist
**Place of Evaluation:** Alamance County Detention Center, Graham, North Carolina
**Date of Report:** 06/02/2014

**Evaluation Procedures and Dates of Evaluation:**
- Clinical interviews, lasting approximately four hours (04/08/14; 04/25/14)
- Telephone contact with Meredith D. Bratt-Boylan, United States Probation Officer (05/30/14)
- Personality Assessment Instrument (PAI) (04/08/14)
- Millon Clinical Multiaxial Inventory – III (MCMI-III) (04/08/14)
- Multiphasic Sex Inventory, Second Edition (MSI-II) (04/25/14)
- General Ability Measure for Adults (GAMA) (04/08/14)
- STABLE 2007 (Dynamic Risk Assessment instrument) (06/01/14)

**The following records were reviewed for this evaluation:**
- Referral for Psychological/Psychosexual Evaluation and Report, from Meredith D. Bratt-Boylan, United States Probation Officer, 03/27/14

**Identifying Information and Reason for Referral:** Van William Savage II is a 27 year old, Caucasian man, who was living in Sanford, North Carolina, at the time of his arrest. On 02/07/14, Mr. Savage pled guilty to Receiving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1). The Honorable Catherine C. Eagles, United States District Court, ordered the completion of a psychological/psychosexual evaluation of Mr. Savage. He is scheduled to appear for sentencing on 08/12/14. At the time of this evaluation, he was being held in the Alamance County Detention Center. He was referred to the current evaluator by Meredith D. Bratt-Boylan, United States Probation Officer.

**Clarification of Purpose of Evaluation and Limits of Confidentiality:** Before beginning the evaluation, the current examiner asked Mr. Savage to read a document, titled, "Sex Offender/ Psychosexual Evaluation: Procedures, Risk and Benefits, and Limits to Confidentiality." The current examiner also asked Mr. Savage to read a Notice of Privacy Practices explaining the use and potential disclosure of his health information. He was given an opportunity to ask questions about the information in these documents. The current examiner explained the issues to be addressed in this evaluation, the procedures used, and the limits of confidentiality. The examiner also explained that he would write a report with the findings of the evaluation, that this report would be sent to the United States District Court and to his probation officer, and that the United States District Court would forward the report to his attorney and the United States District Attorney. Mr. Savage indicated that he understood. He signed the informed consent form, indicating that he agreed to participate in this evaluation. The current evaluator repeated information about the issues to be addressed in this evaluation, the procedures used, the limits of confidentiality, and the distribution of the results at the beginning of the second evaluation session.

5318 Highgate Drive, Suite 131        Phone: 919-419-0524        www.behavioralhealthsolutions.net
Durham, NC 27713                       Fax: 919-419-9651

**Social History:** Except where indicated, the following information was provided by Mr. Savage through interview.

Childhood and Family of Origin: Mr. Savage was born and raised in the Tom's River area of New Jersey. He knew of no medical problems experienced by his mother during her pregnancy or labor. He did not know if his mother used drugs during her pregnancy, although he said he "wouldn't doubt it" because she used drugs while he was a child. He did not know if he was born full term. He believes he was healthy at birth, although he had a heart murmur as a child. He did not know if he achieved developmental milestones within normal limits.

Mr. Savage was raised primarily by his mother and her boyfriend. His biological father left the home before Mr. Savage was born, and he did not know his biological father until he was 16 years old. His mother met the boyfriend when he was 4 or 5 years old. They never married. His mother worked various retail and food service jobs, as well as attempted to operate a landscaping business. His mother's boyfriend painted houses and worked for casinos. His mother and stepfather were never steadily employed. Mr. Savage said his mother's boyfriend was physically abusive to him, his brothers, and their mother. He described his mother's boyfriend hitting him with objects such as sticks and spoons, and he held him by his neck against the wall. His mother's boyfriend also sexually abused him, and he described emotional abuse (for example, being made to stand in the corner with his pants and underwear down). His mother and her boyfriend abused drugs, and Mr. Savage took care of his younger brothers since he was six or seven years old. Mr. Savage's mother and her boyfriend separated when he was 15 years old. Her boyfriend died several years ago. His body was found in the woods approximately six months after he died. Mr. Savage said that it is unknown whether he committed suicide or was murdered. Mr. Savage's mother lives in a boarding house in Sanford, North Carolina. She receives disability due to epilepsy and other medical problems. His relationship with his mother over the past few years has been "alright." He reported no resentment toward her, saying he understands that she was also being abused when he was growing up.

Mr. Savage has three half-brothers, who are the children of his mother and her boyfriend. His half-brother Daniel is 21 years old and is incarcerated for a drug-related crime. His half-brother James is 21 and lives in New Jersey. His half-brother Tyler is 18 and lives in Cary, North Carolina. Mr. Savage has five half siblings with whom he shares his biological father. He reported that he has kept in contact with the two oldest half-siblings (24 year old Rebecca and 22 year old Caitlyn) but has had little contact with the three younger half-siblings.

Mr. Savage said the family moved frequently when he was growing up, and they were "pretty poor." Child Protective Services investigated the family a couple of times, but the children did not disclose the abuse because they were afraid to tell the truth. Child Protective Services never remained involved with the family. At age 15, Mr. Savage and his brothers lived with their aunt and uncle in New Jersey, after their mother and her boyfriend entered a drug rehabilitation program. He continued to live with his aunt and uncle until he graduated from high school. His brothers moved between foster care and their mother's home. Mr. Savage said that living with his aunt and uncle was better than living with his mother and her boyfriend, because his aunt and uncle did not abuse him.

Mr. Savage said that his mother received inpatient substance abuse treatment, but no family members received inpatient psychiatric treatment. No family members received outpatient mental health treatment. His mother, her boyfriend, and his biological father abused drugs. No family members abused alcohol. No family members attempted suicide. Other than his mother's boyfriend, no family members acted violently. His biological father was convicted of a sexual offense, before Mr. Savage established contact with him at age 16. He said that his father reportedly had sexual contact with a female minor who had stated she was above the age of consent. His biological father was also incarcerated for a drug offense. His brother Jason was placed in juvenile detention at age 13 after starting fires at school and the library.

As noted above, Mr. Savage was physically, sexually, and emotionally abused by his mother's boyfriend. He said the family's physical necessities were always met. He described being emotionally neglected and feeling like he and his brothers were always "on [their] own."

Educational History: Mr. Savage graduated from high school in 2005. He neither repeated nor skipped grades. He was diagnosed with Attention Deficit Hyperactivity Disorder, and he was placed in special education classes throughout his education. He was mainstreamed in math his last two years of high school. Mr. Savage said he continues to have difficulty concentrating, although he believes his concentration is better than it used to be. He primarily earned Bs and Cs. Mr. Savage received detention "quite a few times," although he did not know what for, and he received in school suspension one time. He was sent to the principal's office "quite a bit" for misbehavior. While living with his aunt and uncle, he was suspended for three months for starting a fire in the bathroom. He said he lit a piece of paper on fire and then immediately put it in the toilet. He said he was not intending to damage property but just wanted to burn the paper. Mr. Savage said he was teased and bullied throughout most of his education, which negatively impacted his self-esteem and prevented him from learning how to stand up for himself. He was teased and bullied less when he lived with his aunt and uncle, which he attributed to attending a different school and wearing better clothing. He said he kept to himself in high school to avoid getting teased, although he met some friends who remain friends today. He did not tease or bully others.

Mr. Savage received no formal education after graduating from high school. He wanted to attend college but could not afford to do so. He had planned to attend a welding program before his arrest on federal charges related to the index offense.

Military and Vocational History: Mr. Savage enlisted in the Navy in June 2008. He attended Navy Boot Camp for six weeks, soon after his wedding. He said he had "separation anxiety" from his family and wanted to return home. He used razor blades to cut the word "home" into his arm.

After graduating from high school in 2005, Mr. Savage moved to Florida to get to know his father better and start a new life. He lived in Florida for six months, but his father showed little interest in having a relationship with him. He returned to New Jersey to help his mother after she had heart surgery. In 2009, he, his wife, and their daughter lived with his grandmother in Florida for three months. He was unable to find work in Florida. The job market looked better in North Carolina, so the family moved to North Carolina. He and his wife were homeless in North Carolina for three months, while their daughter stayed with his mother's friend and then his aunt. They returned to New Jersey for one year. In 2011, they returned to North Carolina.

Mr. Savage has held many different types of jobs, including cashier, stocker, painter, power washer, landscaping, quality inspector, newspaper delivery, warehouse work, and HVAC installation. He considered his most recent job – quality inspector for Caterpillar – to be his best job, because it paid well. His longest job - with Keen Transport, as a quality inspector and machinery operator - lasted for seven to eight months. He lost the job when his wife reported him to law enforcement in 2012 for the index offense. His shortest job was with McDonalds and lasted for three days at age 18. He said the pace of work was fast and his manager had a short temper; the manager yelled at him for not working fast enough, and he walked off the job. He reported no other times when he walked off a job. He quit a job last year without having another job lined up (a newspaper delivery job, which did not pay enough to cover the wear and tear that the job put on his vehicle).

Mr. Savage said he was fired a couple of times. He was fired from a cashier position after the manager accused him of stealing $180.00 from the cash register drawer, and he was fired from a detailing job at a car dealership when a manager accused him of stealing. Mr. Savage said he never stole from a job. He said he typically works hard and goes "above and beyond." He said coworkers have disliked him for getting promotions quickly. He reported having no preference for men or women supervisors.

Mr. Savage's period of longest unemployment lasted approximately one year, in 2013, which he attributed to his state criminal charges. He received Unemployment for seven or eight months in 2011, and he was previously on food stamps. When asked how he has supported himself when unemployed, he

said he lived with his mother at times, worked odd jobs, and sold possessions. When asked what he will do for work when he is back in the community, Mr. Savage said he will first find whatever job he can, then find a stable full-time job and hopefully enroll in a welding program. He recognizes that his criminal history will make it difficult to find employment.

In terms of his financial history, Mr. Savage reported that he has bad credit due to overusing credit cards and writing bad checks at age 18. He continues to owe money to banks for overdrawn accounts and he owes money to utility companies. He has wanted to pay off his debts and repair his credit, but he has not been able to earn enough money to both support himself and pay off his debts. He said he could have spent money more responsibly, and he believes he has become more financially responsible over the past few years. He never moved to avoid paying rent. He said his lights were turned off because he fell behind on the bill. He borrowed money from family members, some of which he has repaid and some of which he is still trying to repay. He never did anything illegal or unethical to earn money. He found odd jobs through family and friends to earn extra money at times.

Friendships and Romantic Relationships: Mr. Savage identified his children, his mother, and other people in his family as the most important people in his life at this time.

Mr. Savage had a few friends when he was growing up. He identified two friends – Joe and Mark – as his closest friends at this time. He has known both of them since high school. Joe lives in New Jersey, where he is disabled following a car accident. He last saw Joe in December 2013, and they talked about once a month. He and Mark do not talk often and he is not sure what type of work Mark does at this time. He said Mark has been drinking alcohol heavily for the past few years. Joe does not have substance abuse problems. His friends have not had legal problems. When asked about mental health problems, he said Joe is depressed following his injury and inability to earn income.

Mr. Savage said he has been primarily focused on working and taking care of his children. When asked about friendships in North Carolina, he said that he met some people at work but did not socialize with them outside of work. When asked if he has enough friends, he said he would prefer to have a handful of trustworthy friends than have many people he does not really know. He is satisfied with the friendships he has. He has had female friends in the past. He described one male friendship ending badly (the friend suddenly came into money and boasted about it, and he also tried to have sex with Mr. Savage's ex-wife). He said he generally tries to treat other people the way he would want to be treated. Mr. Savage reported feeling lonely, especially the year or two after his marriage ended. He was initially content being single and raising his children, but he started to want a romantic relationship. He said loneliness had not been a major problem before the last few years, although he would feel lonely if he did not have a girlfriend.

Mr. Savage has been married one time, to Shannon. He and Shannon met in September 2007, when he was 20 years old and she was 31 years old. They started dating approximately a week after they met, and he proposed to her the following New Year's Eve. They married in April 2008. He acknowledged that he proposed to her quickly, saying, "I'm a pretty emotional kind of guy." He suggested that he was eager to have a happy family, given his dysfunctional family of origin. He and Shannon's relationship was "decent" for the first one and a half years. However, she cheated on him with several different men. She also had problems with anger management and violence. She threw objects at him and physically assaulted him. Mr. Savage said he was never violent or threatening toward his wife.

Mr. Savage's wife reported his child pornography use to law enforcement. He had asked her for a divorce due to her abusive behavior, which made him fear for their children's safety and mental well-being. He said she called the police the day after he asked her for a divorce.

Mr. Savage recognized that he was "not perfect" in the marriage. He started arguments with his wife. He also cheated on her one time in the beginning of their relationship, which he thought of as "payback" for her cheating on him. When asked why he stayed with his wife, he said that he wanted his children to be raised in an intact family, unlike his own experience. Mr. Savage and his wife remained together after he was released on bail from the state charges. He ended the marriage a couple of months

after his release from jail, when she punched him in front of the children. They are separated but not officially divorced. He said that, even with all of the problems in their relationship, he "still [holds] onto the hope of a happy family." He hopes his ex-wife can "change and be better" so they would have a normal relationship. He said she has made similar statements about wanting to reunite with him.

    Mr. Savage has had several other romantic relationships. His first serious romantic relationship was in high school, with Becky. That relationship lasted for about one year and ended due to an argument. He dated Jen for approximately seven months before he met his wife. She broke up with him after she returned to using drugs and he did not approve. He dated Joannie for about three weeks before meeting Jen. He broke up with Joannie after learning she was planning to cheat on him.

Children: Mr. Savage has two children – four year old Haley and three year old Connor. Mr. Savage had custody of Haley for 18 months between his arrest on state charges and his arrest on federal charges. He said that he and his wife worked out an agreement in court in New Jersey that their daughter would stay with him and their son would stay with her. He received custody of Haley in August 2012. He said he "always wanted a daughter" because he grew up in an all-boy family. He said that he and Haley have a strong bond. He said that raising Haley has not been particularly challenging although there were some trials "like with any child." Haley was living with Mr. Savage's aunt at the time of the first interview, but she was moving to New Jersey to live with her mother in the very near future.

    Mr. Savage's son, Connor, has lived in New Jersey since August 2012. Connor visited with Mr. Savage for one month in August 2013 and then in Christmas 2013. He said he tried to video chat with Connor as much as he could.

    Mr. Savage said that Child Protective Services investigated the family when they were homeless but the case was closed when they moved to New Jersey. He said CPS was involved for two or three months after he was charged in 2012, but the case was closed after he was determined to not be a threat to his children. He said CPS was again involved in August 2012 when he called their hotline due to his wife's drug use (he said he thought he was calling a legal hotline).

    Mr. Savage said that "the happiest days of [his] life" were when his children were born. He described being devoted to his children, saying he wants them to have the loving and safe childhood he did not have. He said that being in jail makes him feel like a failure as a father.

    When asked about personal relationships with other children, Mr. Savage said that a female neighbor had a five year old daughter who was friendly with Haley. He said the neighbor's daughter "warmed up to [him]" and saw him as a father figure after the divorce, when he and her mother had a sexual relationship after he and his wife separated. He reported no other personal relationships with children. He said he prefers spending time with adults over spending time with children in general. However, he prefers spending time with his own children over spending time with adults. He said children do not understand him better than adults, and he said he does not talk to children about his problems.

Behavioral and Legal History: Regarding conduct problems as a juvenile, Mr. Savage said that he did not engage in aggressive behavior toward people or animals. He "never liked confrontation" and did not engage in fights as a child or adolescent. He did not engage in destruction of property, such as fire setting or vandalism. He shoplifted a few times when he was growing up, such as batteries and a portable CD player. He did not steal from family members, and he did not break into other people's homes or cars. He skipped school a few times, and he ran away from home twice (each time for a couple of hours). He never violated curfew. He said that, in high school, he took his uncle's car for a joy ride one time. He engaged in some reckless behavior, such as jumping bicycles off of ramps, but nothing particularly dangerous.

    Referral information states that Mr. Savage was convicted of Misdemeanor Theft of Movable Property and Felony Fraudulent Use of a Credit Card in Ocean County Superior Court, Toms River, New Jersey. He was also convicted of Misdemeanor Pedestrian Interference in Wake County District Court.

When asked about the charges for Misdemeanor Theft of Movable Property and Felony Fraudulent Use of a Credit Card, Mr. Savage said he found a bank card at work, and he used the card to buy gas. He said he had recently turned 18, was living with his mother, and they were fairly poor. His mother was not working, and he was spending a lot of money on gas and food for the house. He said he was offered a pretrial release program involving one year of probation and community service, and he was ordered to repay the stolen funds, and the case should have been dismissed. He said he completed everything required in that program. When asked about Misdemeanor Pedestrian Interference, he said that he was ticketed for panhandling when he was homeless. He paid a fine.

Mr. Savage said he was arrested for unpaid traffic violations on the night before his 20th birthday. He spent two days in jail. He said he was again arrested a couple of years later for unpaid traffic violations and spent two days in jail. He reported no other arrests or times when he was questioned by the police about a criminal matter.

Mr. Savage spent two weeks in jail after he was charged in North Carolina for the index offenses. He was released and remained free on bond for approximately two years. He was taken into custody after being charged in the federal system on 12/31/13. He has been in detention since then. Mr. Savage said he was very depressed when he was first placed in jail, which he attributed to missing his children, facing his sentence, and "feeling like a failure." He said he is mostly concerned about his children while he is in jail and worried that they will believe he abandoned them or does not love them. He reported no problems with other inmates. He has not had difficulties with staff members and he has received no disciplinary write-ups. He has been trying to focus on positive aspects of being in jail, and he said that he has used the time to talk about issues from his childhood that he previously suppressed. Mr. Savage said his attorney has told him to expect some period of incarceration. He occasionally has concerns about surviving incarceration, primarily due to the nature of his crime. He said he hopes to better himself while in prison so that he does not reoffend. He would like to talk to a professional while in prison to find out why he committed his crime and to make sure the problem is resolved.

Medical and Mental Health Treatment: Mr. Savage reported no history of severe medical problems. He has never been hospitalized. He has no history of chronic or serious illnesses. He has not sustained serious injuries. He sought medical treatment at the Emergency Department for serious colds in the past, although he cannot remember the last time he did so. When asked about head injuries, he said he lost consciousness for approximately one minute after being hit on the head while playing baseball when he was 11 years old. He did not receive medical treatment following the head injury.

Mr. Savage has never received inpatient psychiatric treatment. He has been prescribed Celexa (an antidepressant) for the past three months, and he believes it has helped with his depressive symptoms. Mr. Savage received outpatient individual psychotherapy with Susan Maudlin at Daymark from August 2012 to September 2013. He said a judge had ordered that he meet with a psychotherapist due to his child pornography charge. He said Ms. Maudlin was not an expert in issues related to child pornography use, and they discussed "everyday stuff." (The referral information states that he reported his psychotherapy dealt primarily with coping with his formative years and pornography use.) He reported no other outpatient mental health treatment. He was never prescribed medication for inattention or hyperactivity. He said he previously wanted to find a psychotherapist but was afraid that he would be arrested for using child pornography. He said he wants to get help so that he does not use child pornography again. He said he wants to be "normal," meaning be a good father, have a good job, and not engage in illegal behavior.

Mr. Savage underwent a sex offender specific evaluation by David Rademacher, M.A., on 04/02/13 and 04/16/13. On the Wechsler Adult Intelligence Scales, Fourth Edition, Mr. Savage produced a Full Scale IQ score of 112, which is in the High Average range. His score on the Perceptual Reasoning Index was in the Superior range. He displayed a relative weakness on the Verbal Comprehension Index, with a score in the Average range. On the Child Abuse Potential Inventory, he produced an invalid profile due to a tendency to present himself in an unrealistically favorable light. On the MMPI-2, he again presented himself in a somewhat favorable manner. His MMPI-2 profile was in the normal range, suggesting that he viewed his present adjustment as adequate. He reported some personality

characteristics such as oversensitivity, mistrust and suspiciousness that may make him vulnerable to developing psychological symptoms under stress. On the Personal Sentence Completion Inventory, he described his parents' attitude about sexuality as "secretive" and described being sexually molested as a teenager along with his brother. He admitted to being introduced to pornography by his stepfather. He described his sexual abuse as his most uncomfortable sexual experience. He was fairly open about describing his sexual desire, which he characterized as focused primarily on his sexual partner or a sexual "crush" but with no mention of children. He admitted to fantasizing about sex with multiple partners at the same time. He reported that what made him sexually unusual was being open to trying things at least once with his partner. His idea of a pervert was "someone who constantly stares or peeks at someone in a sexual way or tries to watch someone masturbate or have sex, or someone who tries to sexually grab someone else without permission." He reported he would never "force, manipulate, rape or molest anyone." He described seeking passion in his relationships and wanting love to be part of sexuality.

**Substance Use History:** Mr. Savage reported drinking rarely prior to his arrest. He estimated drinking two times in the year before his arrest, when he had one or two beers at barbecues. He said he never drank around his children, and he did not drink until intoxicated. He drank more often before his children were born, at which time he drank once every couple of months when with friends. He became intoxicated occasionally.

Mr. Savage never used marijuana or other illegal drugs. He never abused prescription medication.

**Sexual History:** Mr. Savage reported being sexually abused multiple times, by different perpetrators, while growing up. He was sexually abused on one occasion at age 8 or 9, by a 12 year old girl. His mother's boyfriend started sexually abusing him at age 8 or 9, and he continued to sexually abuse him until the perpetrator entered drug rehab and Mr. Savage moved in with his aunt and uncle. Mr. Savage was raped at age 19 by a male neighbor in his 50s. He described the perpetrator buying objects for him and his brothers, as well as telling them threatening stories about having connections to the Mafia. The perpetrator showed him pornography, and then sexually assaulted him. He said the abuse continued for a year and a half. He never sought help because of embarrassment and because he never learned how to stand up for himself. He said the perpetrator also sexually assaulted his brothers, and one of his brothers eventually disclosed it. The perpetrator was arrested and incarcerated. Mr. Savage said that his sexual abuse and sexual assault may have interfered with him learning the difference between right and wrong in terms of sex, saying he was not taught the difference when growing up. He said that he did not start viewing child pornography on his own until after the sexual assault.

Mr. Savage reported no exposure to adult nudity or adult sexual behavior as a child. He did not engage in normative sex play (such as playing doctor). He did not get in trouble for inappropriate sexual behavior as a child. He did not have sexual contact with other family members. He has never had sexual contact with an animal.

Mr. Savage first masturbated at approximately age 11. As an adolescent, he masturbated approximately once every couple of weeks. As an adult, he masturbated once or twice a month when he was single, and he masturbated less often when married. His period of peak masturbation occurred when he was 18 years old, when he masturbated once a week. He never injured himself through masturbation. He never masturbated in public or used an object or device while masturbating.

Mr. Savage reported no homosexual sexual fantasies. He reported no consensual sexual contact with a male partner. He reported no conflict or distress related to gender identity issues.

Mr. Savage first had consensual sexual contact at age 17, when he and his girlfriend had sexual intercourse. He reported having seven sexual partners during his lifetime. His partners have included his wife, girlfriends, and a one night stand with a woman while he was married. He never paid someone for sex. He never had sex only because he or his partner was intoxicated or high. He never coerced a partner into sex. He said he regrets cheating on his wife. He said his sexual relationship with his wife was initially positive. However, he lost interest in having sex with her due to her repeatedly cheating on him

and her physical and mental abuse of him. She became angry at him for not wanting to have sex with her. He said they had no disagreements about what type of sexual behavior they would engage in. Mr. Savage never had sex with multiple partners. He never had sex in a public place or in a potentially risky situation, like a moving vehicle. He never contracted a sexually transmitted disease. Mr. Savage reported no problems with erectile dysfunction or premature ejaculation.

Mr. Savage reported neither increases nor decreases in his interest in sex. He does not believe he thinks about sex frequently or excessively, and his mind does not turn to sexual topics when he is not thinking about something else. He did not know if he sought sex when he was anxious or depressed, saying he only realized recently that he has been depressed. He said he did not seek sex when he felt angry.

Mr. Savage reported contributing to several unplanned pregnancies. His wife had an unplanned pregnancy, which ended in a miscarriage. A girlfriend before his marriage became pregnant accidentally, and she induced a miscarriage (reportedly by having someone punch her in the stomach). A sexual partner after his marriage also became pregnant but had a miscarriage.

Mr. Savage first encountered pornography at age 11, when his mother's boyfriend gave him pornographic magazines. He said magazines were both *Playboy*-type magazines and those that depicted explicit sexual behavior. He believes his mother's boyfriend gave him those magazines as a way to teach him about sex. Soon after that, his mother's boyfriend put a computer in his room and taught him how to find pornography on the Internet. He said he masturbated with pornographic magazines as an adolescent. He owned approximately four magazines (given to him by his mother's boyfriend) before turning 18 years old. He started buying pornographic magazines, mostly *Playboy* and *Penthouse*, after he was 18 years old. He said he has not used pornographic magazines much in the past couple of years, and he estimated owning one magazine during that time. He said no magazines have depicted children or minors. Mr. Savage has never used pornographic videotapes or DVDs, except those shown to him by the man who sexually assaulted him at age 19.

Mr. Savage first encountered Internet pornography at age 11 or 12. He estimated using Internet pornography two or three times each month as an adolescent. He used pornography that depicted naked women or heterosexual sexual behavior. He stopped using Internet pornography at age 15, when he moved in with his aunt and uncle. He returned to Internet pornography at age 19, when the male neighbor who sexually assaulted him showed him pornography (including child pornography). He did not have a computer again until he met his wife (because he could not afford it). During the two months that they had a computer (before having to get rid of it due to financial problems), he looked at Internet pornography one or two times. He next owned a computer when the family moved to North Carolina in February 2011. He said pornography use never interfered with work responsibilities, sleeping, or other sexual relationships.

Mr. Savage reported no sexual chats with strangers over the Internet.

When asked if any of his sexual thoughts distressed him, Mr. Savage said it has bothered him since long before his arrest that he became sexually aroused by child pornography. He reported no fantasies or behaviors involving bondage (being tied up by a sexual partner or tying up a sexual partner), masochism (being hurt or humiliated by his sexual partner), or sexual sadism (hurting or humiliating his sexual partner). He reported no fantasies or behaviors associated with voyeurism (watching a nonconsenting person who is undressed or having sex). He reported no fantasies or behaviors associated with exhibitionism (exposing his genitals to a nonconsenting person) or frottage (touching or rubbing against a nonconsenting person). He reported no sexual fetishes (sexual arousal to inanimate objects or nonsexual body parts). He reported no transvestism (sexual arousal to wearing women's clothing). He reported no fantasies involving rape.

Mr. Savage reported no difficulty controlling his sexual urges or behavior.

**Current Offense:**
Collateral Version: Referral information indicates that, on 01/16/12, the Lee County Sheriff's Office was contacted about a sexual assault on a minor which had allegedly taken place in Sanford. Mr. Savage was

determined to be the suspect. The reporting person was his wife, Shannon. After deputies arrived at the residence, Mrs. Savage reported she witnessed the defendant downloading child pornography sometime in 2008 and continuing until 2012. She reported that, on 01/15/12, Mr. Savage took a bath with their two year old daughter. His daughter was straddling his pelvic area. Mrs. Savage said she could see that his penis was erect and it was in-between the legs of their daughter. She immediately took their daughter away from him. Investigation records indicate that Lee County Department of Social Services did not substantiate the report of sexual abuse against Mr. Savage's daughter. On 08/03/13, Mrs. Savage wrote a letter stating that he never sexually assaulted either of their children.

    Mr. Savage admitted to investigating officers that he downloaded child pornography. He denied ever sexually assaulting a child. He admitted to having fantasies of doing things with minors but stated he would never act on those thoughts. A search warrant was executed for the residence and all electronics on 01/16/12.

    According to the forensic analysis by the North Carolina State Crime Laboratory, there were images on Mr. Savage's cellphone, hard drive, and camera of children performing lewd and lascivious acts. The acts included vaginal and anal penetration, cunnilingus, and fellatio. The National Center for Missing and Exploited Children (NCMEC) reviewed the images contained on the computers at the time of the search and advised that 62 images and eight videos were found. Description of some of the images found indicate that they depicted prepubescent girls.

    On 01/17/12, Mr. Savage was arrested and charged with Felony Third Degree Sexual Exploitation of a Minor. These charges remain pending in Lee County Superior Court.

    During the presentence interview on 02/11/14, Mr. Savage admitted to "not wanting to watch child pornography" but stated he could not fight the "urge." He said he contemplated committing suicide through carbon monoxide poisoning after his arrest on 01/17/12.

    In a telephone contact on 05/30/14, Ms. Bratt-Boylan confirmed that, according to her records, child pornography images were found on a camera seized from Mr. Savage. She said that he was not accused of manufacturing child pornography or taking pictures of children. She also stated that more recent forensic analysis of a laptop that he sold right before being taken into federal custody revealed many files of child pornography as well. She confirmed that these images would have represented child pornography that he had acquired after he was charged in North Carolina in 2012 (and not that the laptop was something that had been missed during the original search and seizure in January 2012).

Mr. Savage's Version: Mr. Savage said he first saw child pornography at age 11 or 12, when he accidentally encountered it online. At age 19, the man who sexually assaulted him showed him child pornography. He said that he and his wife started looking at child pornography together in August or September 2011. He said his ex-wife told him that she had previously used child pornography of boys before they dated. He told her about being shown child pornography by the man who sexually assaulted him. He said that he and his wife looked at child pornography infrequently between September and December 2011. They also looked at pornography depicting heterosexual sex and lesbian sex. He said they did not have sex while looking at child pornography although they occasionally had sex after looking at child pornography.

    Mr. Savage said he had downloaded child pornography for a couple of months before his arrest. He said his wife also downloaded and viewed child pornography but she denied it when asked by law enforcement. Mr. Savage said he occasionally looked at child pornography alone. He looked at images of girls only, and he viewed both prepubescent and pubescent girls. He never used child pornography exclusively. He said he generally did not focus on one image but flipped through a series of images. Mr. Savage stated he downloaded child pornography from a peer to peer program and saved the images. He said he did not move the images but left them in the default folder where they were downloaded. He said he never used modelling sites or clothing catalogues depicting children for sexual gratification. He reported no sexual thoughts about children he encountered in real life.

When asked if he found child pornography to be sexually arousing, Mr. Savage said it was arousing but he did not want it to be arousing. He said he did not have sexual thoughts about children he encountered in real life, including his daughter when bathing.

When asked why child pornography is illegal, Mr. Savage said, "Because they're minors." When asked to expound on that, he said he was "never taught why" but knows child pornography is wrong because it depicts minors. He stated that sexual contact between adults and children is wrong. He said children do not know the difference between right and wrong and they cannot choose whether they want to have sex. He reported knowing of no situations where it would be acceptable or understandable for an adult to have sexual contact with a child.

When asked about the allegations of being sexually aroused while in the bathtub with his daughter, Mr. Savage said those allegations were false. He said the allegations were something invented by his wife.

When asked about child pornography on his camera, he said that he never took pictures of underage children.

Mr. Savage said he wants professional treatment, by someone with expertise in the area of child pornography use. He would like to understand why he offended.

**Behavioral Observations, Mental Status, and Psychological Functioning:** Mr. Savage presented as a Caucasian man, whose appearance was consistent with his chronological age. He had an average build and height. His hygiene was good, and he appeared healthy. His gait and movements were unremarkable. His speech was normal in quantity and quality. His thought processes were logical and goal directed. He did not respond to internal stimuli, and he did not express odd or delusional beliefs. He described his mood as "content," and his affect was appropriate and full range. He reported no suicidal or violent thoughts. He interacted with the evaluator in a polite way, although he made little eye contact when interviewed. He cooperated fully with the demands of the evaluation.

Mr. Savage was alert and fully oriented when interviewed. His fund of information was mildly impaired. His attention and concentration were intact. His immediate recall of verbal information was intact. His delayed recall of the same information was intact. His long term memory was intact. Language functions (naming and repetition) were intact. Abstraction was intact. Social judgment was intact. He did not display impulse control problems. Insight appeared intact.

When asked about problems with depression, Mr. Savage said that he had not thought he had problems with depression before his detention. He has since realized that childhood trauma continues to impact him, leading to low self-esteem, depressed mood, and low motivation. He was never depressed for two weeks, although he reported experiencing a couple days of depressed mood most weeks. He also reported feeling happy and content for a few weeks at a time. He has noticed feeling less depressed when he has been able to talk to other people (such as in jail). He reported anhedonia (decreased capacity for pleasure) and decreased motivation. He has had difficulty falling asleep for several years, because his mind "races." He reported no difficulty staying asleep. He had little appetite prior to his arrest and would skip breakfast or lunch; he did not experience weight loss. When asked about suicidal ideation, he said that he had considered killing himself through carbon monoxide poisoning when his wife turned him in for child pornography use. He said that he was told he could not see his children and he assumed he would never see them again, and he recalled his biological father abandoning the family prior to Mr. Savage's birth. He believes he would have killed himself if he had not been arrested. He reported no suicidal ideation since then. He has never attempted suicide. He has never engaged in self-injurious behavior, other than cutting the word "home" into his arm at boot camp.

Mr. Savage reported no manic symptoms, such as periods of elevated mood or irritability, decreased need for sleep, or pressured speech.

Mr. Savage reported no problems with feeling anxious or nervous. He said he worries about common concerns (such as paying bills) but worrying has not prevented him from functioning. He reported no obsessions or compulsions. He has never had a panic attack. He has no phobias. He reported a history of trauma. In addition to childhood abuse and sexual assault at 19, Mr. Savage reported

that a tornado damaged the family home in April 2011 while the family was inside. His mother and wife were injured, and he blames himself for the injuries and trauma his family experienced because he chose to disregard the warnings about a tornado until it was too late to leave. He said he continues to feel distressed about the abuse and sexual assault from his childhood and adolescence. He has occasional nightmares about these incidents but no flashbacks. When asked about avoidance, he said he dislikes violence and altercations. Mr. Savage said he tries to "block out" memories of the abuse he experienced by his mother's boyfriend but it "comes back to [him]."

Mr. Savage said that he occasionally believes people are talking about him behind his back and ridiculing him, and he attributes those beliefs to his own insecurities. He reported no paranoid ideation or grandiosity. He reported no auditory or visual hallucinations.

Mr. Savage reported no dissociative symptoms such as depersonalization, derealization, episodes of "lost time," or being told that he did something that he did not remember.

Mr. Savage reported no significant problems with boredom.

When asked about anger, Mr. Savage said he has never gotten angry quickly. He rarely raises his voice. He has never threatened anyone. When his wife assaulted him, he tried to defend himself by restraining her. However, he never hit her or assaulted anyone else. He said he does not hold grudges against others. He reported no thoughts of revenge or violence.

Mr. Savage said he feels guilty about his offense conduct. He also feels guilty for forgetting a bag of gift shop items his mother had bought during a school trip to the Statue of Liberty. He said he does not lie often and does not believe he is skilled at lying. He said that, as a child, he would lie to avoid beatings, but the consequences were more severe if his lying was discovered. He said he is not skilled at manipulating people. When asked about impulsive behavior, he said that he would go out to dinner instead of cooking at home. He reported no other impulsive behavior.

**Psychological Test Results:**
Psychopathology and Personality: The PAI is a self-administered, objective inventory of adult personality. It is designed to provide information about an individual's personality and psychopathology. It contains 344 multiple-choice items which comprise several validity, clinical, and personality scales. When interpreting results, an individual's scale scores are compared to the normative scores of a large sample of American adults. This standardization sample was selected to resemble the results of the United States Census in terms of proportions of age, race, and gender in the population. The PAI contains several validity scales, which provide information about the respondent's test-taking behavior. Review of Mr. Savage's validity scale scores indicates that he provide some unusual responses to test items, which may reflect carelessness or idiosyncratic item interpretation. His validity scale scores also suggest a mild tendency to portray himself as relatively free of common shortcomings to which most people will admit when describing themselves honestly. The results of this administration of the PAI may not accurately describe Mr. Savage's psychological functioning.

Mr. Savage produced no elevated scores on the clinical scales of the PAI. He produced an elevated score on a subscale related to psychological consequences of traumatic events. Individuals with similar results report having experienced a disturbing event which continues to be a source of distress and produce recurrent episodes of anxiety. Mr. Savage's results indicate that, interpersonally, he is likely to be modest and self-conscious in social situations. Similar individuals are meek and unassertive, and they have difficulty standing up for themselves. His results suggest no difficulties related to alcohol or drug use. He does not report thoughts of suicide or death. Individuals with similar results report that their close relationships are supportive. His results indicate that he acknowledges problems in his functioning and the need for help in dealing with those problems.

The MCMI-III is a self-administered objective inventory of adult personality, designed to provide information about an individual's personality difficulties and clinical problems. It comprises 175 true-false items that address problematic personality characteristics as well as clinical syndromes. The instrument is systematically linked to a comprehensive clinical theory of personality. An individual's responses are compared to the scores of sample of patients who completed the instrument in outpatient or

inpatient mental health treatment settings across the United States. The normative sample is diverse in terms of gender, age, race, educational level, and marital status. The MCMI-III contains several validity scales that assess an individual's test taking behavior. Review of Mr. Savage's validity scale scores indicates that he paid adequate attention to item content and described himself in an accurate way when answering test items. The results of this administration of the MCMI-III are considered to be a valid description of his psychological functioning.

Mr. Savage's MCMI-III profile includes an elevated score on the Depressive personality scale. Individuals with similar results experience emotional pain as permanent parts of their lives. They have lost hope of experiencing joy or pleasure in the future. They experience periods of anxiety and depression. They think in a self-denigrating and pessimistic way, and they feel worthless. They lack self-esteem, and they spend time recollecting past misfortunes and anticipating future difficulties. Similar individuals undermine and sabotage themselves.

Mr. Savage's responses also produced elevations on subscales of the Compulsive personality scale. Individuals with similar results construct their worlds in terms of rules and schedules. They are rigid and stubborn, and they become upset by unfamiliar or novel ideas or customs. They display an unusual adherence to social conventions and propriety. They are overly conscientious about morality and ethics, and they prefers polite and formal relationships.

Psychosexual Functioning: The MSI II is a theory based, nationally standardized self-report questionnaire. It is designed to assess the psychosexual characteristics of sexual offenders. It is comprised of 560 true-false questions, divided into a number of scales and indices. An individual's responses and scale scores are compared to the scores of a standardization sample, whose proportions match the US census in terms of age, occupation, education, ethnicity, and marital status. The validity of the MSI II has been supported in many studies of sex offenders. The MSI II contains a number of validity scales that assess a respondent's test taking behavior and possible bias. Review of Mr. Savage's validity scale scores indicates that he attended adequately to item content when completing the instrument. He may have been guarded and defensive when answering test items, and he may not have been adequately disclosing about himself. The results of this administration of the MSI II may not fully describe his psychosexual difficulties.

Mr. Savage acknowledged on the MSI II that he sought child pornography. He acknowledged that he was sexually aroused to child pornography and used it for masturbation. He places some responsibility for his offense conduct on external factors – that he had been molested as a child, that he was treated badly, and that his family had problems. He did not endorse items related to fantasies or urges involving children. He did not report attempting to manipulate a child into sexual contact or sexually assaulting a child. His results indicate that he has always known that sexual contact with a child and raping an adult are unethical.

Mr. Savage did not report fantasies, urges, or behaviors associated with other sexually offensive behavior, such as rape, exhibitionism, or voyeurism. He did not report soliciting a child for sex over the Internet. He did not report engaging in sexually harassing behavior such as frottage.

Mr. Savage identified his sexual orientation as heterosexual. He did not report paraphilic interests such as sadism, masochism, fetishes, or transvestism. He did not report sexual dysfunction such as premature ejaculation or erectile difficulties.

Mr. Savage's MSI II results suggest that he experiences marked anxiety around adult women. Similar individuals feel inadequate and inferior around adult women, such that it interferes with their abilities to participate in adult interactions. His results also indicate that he feels mistreated and misunderstood throughout his life, and he may view himself as a victim. His results indicate that he believes he was previously preoccupied with sex, but he does not report current sexual preoccupation.

Mr. Savage's results indicate that he is interested in receiving professional help for his sexual behavior

Intellectual Ability: The GAMA is a 66-item, self-administered instrument that provides a nonverbal estimate of general intelligence. Test items require the individual to apply reasoning and logic to solve problems that exclusively use abstract designs and shapes. Because the test is entirely nonverbal, problems with general knowledge, verbal expression, or verbal comprehension are minimized. Therefore, the test is accessible to a wide variety of people with different communication skills and diverse linguistic, cultural and educational backgrounds. The GAMA produces an IQ score with a mean of 100 and standard deviation of 15. Therefore, scores ranging from 85 to 115 are considered "Average." Significantly higher scores suggest greater intellectual ability in the areas measured, and significantly lower scores suggest intellectual deficits.

Mr. Savage obtained a GAMA IQ score of 133 on this administration. This score is in the Very Superior range of intellectual functioning, relative to his peers. The score corresponds to the 99th percentile of scores among his peers (i.e., his score is as high as or higher than 99 percent of the scores obtained by his peers; it is lower than approximately 1 percent of the scores obtained by his peers). Review of subscale scores does not indicate significant variability among the intellectual abilities assessed.

**Dynamic Factors Related to Risk of Sexual Recidivism:** The STABLE-2007 is a companion instrument to the STATIC-99R. (Although the STATIC-99R is useful in estimating the risk of sexual recidivism, it is not recommended for use among sexual offenders whose sexual offense history consists solely of possession of child pornography). The STABLE-2007 assesses dynamic risk factors, which are those factors that are open to change over time. Dynamic risk factors are also those that may be amenable to treatment and supervision. As such, an offender's number of dynamic risk factors represents the level of intervention (treatment and supervision) needed to reduce his risk of sexual recidivism. It is intended to focus on more immediate aspects of the offender's life (i.e., within the past year). The STABLE-2007 produces scores from 0 to 26, with higher scores indicating more dynamic risk factors associated with sexual recidivism. The STABLE-2007 is currently intended for use with adult men who have sexually offended against identifiable victims. Many of the dynamic risk factors that it assesses are also believed to be relevant to child pornography offenders, although it is not clear whether the ways that the risk factors are defined on the STABLE-2007 are equally applicable to child pornography offenders.

Mr. Savage obtained a STABLE-2007 score of 6, which is in the **Moderate needs** category. Five dynamic risk factors are relevant to Mr. Savage: some lack of positive social influences; lack of stable intimate relationship at this time; some evidence of social rejection; some evidence of sexual preoccupation (as indicated by regular use of pornography); and evidence of deviant sexual preference (as indicated by his acknowledgement of sexual arousal to child pornography). Risk factors that are not relevant to Mr. Savage are: hostility to women; lack of concern for others; impulsivity; poor problem solving skills; negative emotionality; use of sex as a coping strategy; and lack of cooperation with supervision. The item Emotional Identification with Children was not scored because there is no evidence that he has offended against a prepubescent child.

**Conclusions and Recommendations:** Van William Savage II is a 27 year old, Caucasian man, who was living in Sanford, North Carolina, at the time of his arrest. On 02/07/14, Mr. Savage pled guilty to Receiving Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1). The Honorable Catherine C. Eagles, United States District Court, ordered the completion of a psychological/psychosexual evaluation of Mr. Savage. He is scheduled to appear for sentencing on 08/12/14. At the time of this evaluation, he was being held in the Alamance County Detention Center. He was referred to the current evaluator by Meredith D. Bratt-Boylan, United States Probation Officer.

Mr. Savage has a history of trauma, starting in childhood and continuing into adulthood. He meets diagnostic criteria for Posttraumatic Stress Disorder. Trauma he has experienced includes physical, emotional, and sexual abuse as a child; sexual assault as a young adult; and the threat of death of himself and his family during a tornado. He experiences intrusive and distressing memories as well as distressing dreams about past trauma. He attempts to avoid the distressing thoughts and memories associated with

the trauma. He has persistent negative beliefs about himself (in the form of low self-esteem), as well as negative emotional states (depression, guilt) and difficulty experiencing positive emotions. He has difficulty with concentration, sleep disturbance, and reckless or self-destructive behavior. It is likely that his childhood abuse and neglect contributed to his lack of assertiveness, because his perceptions about himself reduce his motivation and ability to standing up for himself. Moments of impulsive and self-destructive behavior, such as cutting the word "home" into his arm at boot camp, may reflect discrete episodes of intense fear that were triggered by stimuli reminiscent of his trauma.

Although Mr. Savage was reportedly diagnosed with Attention Deficit Hyperactivity Disorder as a child, it is also possible that inattention displayed as a child reflected a consequence of the ongoing trauma in his home. Impaired concentration is one symptom of Posttraumatic Stress Disorder.

Mr. Savage reported a history of depressive symptoms, which he has only recognized since being in detention. He reported low self-esteem, depressed mood, low motivation, anhedonia, decreased appetite, and previous suicidal ideation. He has not experienced depressive episodes for periods of two weeks, as is required for a diagnosis of Major Depressive Disorder. He also does not report having experienced depressed mood for most of the day, for more days than not, as required for a diagnosis of Persistent Depressive Disorder. In the opinion of this evaluator, his depressive symptoms are more likely to be a feature of Posttraumatic Stress Disorder. His personality test results are not consistent with a mood disorder such as Major Depressive Disorder or Persistent Depressive Disorder. Rather, his results on the MCMI-III are consistent with someone who assumes emotional pain will be a permanent part of his life, who has lost hope of experiencing pleasure in the future, who thinks of himself as worthless, and who undermines and sabotages himself.

Mr. Savage displays other psychological characteristics that have impacted his functioning in the past and may continue to interfere with his functioning in the future. He has displayed poor judgment as a young adult, which has led to homelessness and financial problems. He also displayed instances of impulsivity, again as a young adult, including quitting a job precipitously and proposing marriage to his ex-wife after dating briefly. The most prominent examples of poor judgment and impulsivity occurred when he was in his late teens and early 20s, and may reflect immaturity at least in part. It is possible that, as Mr. Savage ages and matures, his judgment and impulse control will improve.

Mr. Savage's social functioning represents an area of concern. He reported having one or two long-term friendships, although he has limited contact with them because they live in different states. He has not developed meaningful friendships in North Carolina. Since the end of his marriage, his relationships with his children have been primary for him. Mr. Savage maintained a long-term marriage with his ex-wife, although he failed to stand up for his own needs in the face of her reported infidelity and violence. Despite the marked challenges in their marriage, he hopes that he and his wife may reunite. His results on the MSI II indicate that he feels insecure and inadequate during interactions with adult women.

In terms of his psychosexual functioning, Mr. Savage reported being sexually abused by his mother's boyfriend for several years, as well as by an older child on one occasion. He was sexually assaulted over the course of a year and a half by an older man, when he was a young adult. Often, sexual abuse and sexual assault impacts a victim's ability to protect him- or herself in later sexually coercive situations, leading to further sexual abuse. In the same way that Mr. Savage has difficulty standing up for himself in non-sexual situations, he may have difficulty standing up for himself in sexual situations as well.

Mr. Savage reported contributing to multiple unplanned pregnancies. It is possible that these unplanned pregnancies reflected situations where his partner insisted on sexual intercourse despite lack of birth control, and Mr. Savage complied. Of course, it is also possible that unplanned pregnancies represent additional instances of impulsivity and poor judgment on Mr. Savage's part.

Mr. Savage appears to have some problems related to sexual preoccupation. On the MSI II, he acknowledged previous sexual preoccupation, although he did not report current problems with sexual preoccupation. It is noteworthy that a laptop he sold prior to being taken into custody on the current federal charges reportedly contained child pornography images. Apparently, these files were downloaded after he was charged with child pornography possession in North Carolina in 2012. The referral

information indicates that Mr. Savage admitted to "not wanting to watch child pornography" but stated he could not fight the "urge." Downloading child pornography while facing pending child pornography charges indicates sexual preoccupation or difficulty with sexual self-control.

Mr. Savage acknowledged seeking and downloading child pornography for a period of several months before his January 2012 arrest. As noted above, he apparently returned to child pornography use between his arrest in January 2012 and his detention in December 2013. He stated that he initially encountered child pornography at age 11 or 12, but he was then shown child pornography again at age 19 by the man who sexually assaulted him. He described seeking and viewing child pornography with his wife, saying that she had used child pornography before their marriage. He also stated that he viewed child pornography on his own. Mr. Savage said he never used child pornography exclusively. He acknowledged that he was sexually aroused to child pornography, although he apparently did not find his sexual arousal to be acceptable. Referral information states that he reported sexual fantasies involving minors. During the current evaluation, he indicated that he believes the sexual abuse of children to be unacceptable, and he understands that children cannot consent to sex. He repeatedly stated that he wants treatment so that he can understand his reasons for using child pornography and to ensure that he does not return to using child pornography.

Mr. Savage meets diagnostic criteria for Pedophilic Disorder, the essential features of which are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children. Additionally, the individual with Pedophilic Disorder must have either acted on these sexual urges or the urges or fantasies cause clinically significant distress or impairment. Possession of pornography depicting prepubescent children is considered to be an important indicator of sexual interest in prepubescent children. The diagnosis is specified as "Nonexclusive Type" to reflect Mr. Savage's sexual interest in adults as well as children. The diagnosis is further specified as "Sexually attracted to females" to reflect that his pedophilic interest is limited to girls.

Mr. Savage stated that he has never sexually abused a child. He was alleged to have been sexually aroused while bathing with his daughter, but Child Protective Services did not substantiate sexual abuse. During the current evaluation, he stated that those allegations had been invented by his wife.

Estimating Mr. Savage's risk of committing additional sexual offenses requires consideration of the base rates of recidivism among offenders with similar histories and characteristics, an assessment of the presence of dynamic risk factors, and an assessment of the presence of possible protective factors. In terms of the base rate of recidivism among similar offenders, research indicates that men whose only sexual offense conviction has been for possession of child pornography generally commit new sexual offenses at a low rate. The exception to these findings tends to be those offenders with a history of prior arrests. Child pornography offenders with prior legal histories - such as Mr. Savage – tend to commit new sexual offenses at a higher rate than child pornography offenders without prior convictions.

Mr. Savage displays a moderate number of dynamic risk factors associated with increased risk of sexual recidivism. As indicated by the STABLE-2007, Mr. Savage lacks positive social influences; lacks a stable intimate relationship at this time; displays social rejection; displays sexual preoccupation; and displays deviant sexual preference. It is noteworthy that he apparently downloaded and possessed child pornography after his 2012 arrest, while he was on pretrial release. Returning to use of child pornography while facing legal consequences suggests significant problems with sexual preoccupation and/or sexual self-control.

Mr. Savage displays several positive factors that may protect him against reoffending. He does not display many dynamic risk factors associated with sexual recidivism, such as hostility to women; lack of concern for others; current impulsivity; poor problem solving skills; negative emotionality; use of sex as a coping strategy; or lack of cooperation with supervision. He does not excuse or condone the sexual abuse of children. Although he experienced sexual arousal when using child pornography, he does not find that sexual response to be acceptable, which suggests internal motivation to change. He is interested in treatment for his sexual behavior problem. He does not abuse alcohol or drugs, which would otherwise impair his judgment and decrease his inhibitions.

    Considering the base rate of reoffending among similar offenders, the presence of a moderate number of dynamic risk factors, and the presence of possibly protective factors, Mr. Savage's risk of committing additional sexual offenses is considered to be Moderate.

    It is recommended that Mr. Savage be referred to sex offender treatment to reduce his risk of committing additional sexual offenses. Treatment should address the dynamic risk factors identified in the current evaluation – lack of positive social influences; lack of healthy intimate relationship; social rejection; sexual preoccupation; and deviant sexual interests. Mr. Savage will benefit from developing skills to improve self-control when using the Interne. He will also benefit from assistance in developing friendships and intimate relationships.

    It is also recommended that Mr. Savage receive individual psychotherapy focused on his history of trauma. Treatment should help him to recognize the impact that his traumatic history has had on his psychological, behavioral, and interpersonal functioning and help him to develop methods to manage those consequences.

    It is recommended that Mr. Savage receive regular medication management sessions to ensure that pharmacotherapy is adequately addressing his symptoms of depression.

    Mr. Savage should not have unsupervised access to the Internet until he has made sufficient progress in treatment to manage his behavior. It will be useful for him to have increased access to the Internet while receiving sex offender treatment in the community, so he can learn and practice self-management skills.

**IMPRESSIONS:** According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, (DSM-5)* by the American Psychiatric Association, Mr. Savage's diagnoses are considered to be as follows:

    309.81  Posttraumatic Stress Disorder
    314.00  Attention-Deficit/Hyperactivity Disorder, Predominantly inattentive presentation, by history
    302.2    Pedophilic Disorder, Nonexclusive Type, Sexually Attracted to Females
    V62.5   Imprisonment or Other Incarceration

Keith R Hersh, Ph.D.
Licensed Psychologist (NC #2693)